FILED
2011 Jul-20  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| DIANE F. WARREN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 4:10-CV-1071-VEH** |
| | ) | |
| CHEROKEE COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Diane F. Warren ("Ms. Warren") initiated this discriminatory discharge lawsuit arising under the Age Discrimination in Employment Act ("ADEA") against Defendant Cherokee County Board of Education (the "BOE") on April 26, 2010.  (Doc. 1).  Pending before the court is the BOE's Motion for Summary Judgment (Doc. 12) (the "Motion") filed on March 3, 2011.  The BOE filed all of its supporting materials on this same date.  (Docs. 13-19).

Ms. Warren filed her opposing brief (Doc. 20) and evidence (Doc. 21) to the Motion on March 24, 2011.  On April 7, 2011, the BOE followed with its reply.  (Doc. 22).  Accordingly, the Motion is now under submission, and, for the reasons

explained below, is due to be granted on the merits, but otherwise denied.

## II.    FACTUAL BACKGROUND[1]

### A.    Ms. Warren's Employment By the BOE

In the spring or early summer of 2005, when she was 47 years old, Ms. Warren interviewed with Paul McWhorter ("Mr. McWhorter"), the principal of Gaylesville High School ("Gaylesville"), a part of the Cherokee County School System[2] for a position as the family and consumer science teacher at that school.  AF No. 1.1.  Mr. McWhorter is eight years older than Ms. Warren.  AF No. 1.2.

The family and consumer science position was vacant because the employment

---

[1]  Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

These facts are taken from the BOE's narrative summary of undisputed facts, Ms. Warren's opposition, and deposition excerpts from the record.  (*See generally* Doc.  13 ¶¶ 1-59; Doc. 20 at 1-4 ¶¶ 5, 8-10, 13, 15-16, 18, 21-22, 28, 33, 44, 48, 51). Finally, only facts cited by the parties that are material to the court's ruling on summary judgment have been included in this background.

[2] *See* http://gs.cherokeek12.org (accessed on July 15, 2011).

contract of the previous family and consumer science teacher, Stacy Bailey ("Ms. Bailey"), was not renewed.  AF No. 2.1.  Ms. Bailey was 28 years old at the time of her non-renewal.  AF No. 2.2.

Mr. McWhorter recommended to the superintendent, Brian Johnson ("Mr. Johnson"), that Ms. Warren be hired for this position.  AF No. 3.1.  Mr. Johnson then recommended Ms. Warren for the open position to the BOE which, in turn, approved the recommendation.  AF No. 3.2.  Accordingly, Ms. Warren was hired as family and consumer science teacher at Gaylesville for the 2005-06 school year.  AF No. 4.

Ms. Warren received a nine month contract.  AF No. 5.1.  Prior to April, 2002, the BOE gave its vocational teachers ten month contracts.  AF No. 5.2.  However, for financial reasons, all vocational teachers hired after April, 2002, including Ms. Warren and her successor, received nine month contracts.  AF No. 5.3.  The BOE could not unilaterally reduce the contracts of the tenured vocational teachers hired before April, 2002 from ten to nine months because those teachers have a property interest in the entirety of their contract according to Alabama law.  AF No. 5.4. While the BOE maintains there is no difference in the job duties given to vocational teachers with ten month and nine month contracts, Ms. Warren disputes this. (*Compare* Doc. 19-4 ¶ 4 *with* Doc. 14-1 at 103-04).

As a family and consumer science teacher, Ms. Warren's job duties included

being the advisor for the school's Family Career and Community Leaders of America ("FCCLA") organization.  AF No. 6.  The FCCLA is a student organization which promotes leadership and community involvement.  AF No. 7.1.  It is an extension of the family and consumer science classroom.  AF No. 7.2.  The FCCLA elects officers, meets each month, and belongs to state and national FCCLA organizations.  AF No. 7.3.  While both sides agree that working with the FCCLA is an integral part of the family and consumer science teaching position, Ms. Warren disputes that this includes travel to state and national FCCLA meetings.  (*Compare* Doc. 18-2 at 17 *with* Doc. 20 at 1 ¶ 8; *see also* Doc. 14-1 at 77 (Ms. Warren's indicating that no one explained the FCCLA advisor role to her); Doc. 15-1 at 205 (Ms. Warren's describing Mr. McWhorter's failure to forewarn her that such travel was one of her job requirements)).

## B.    Ms. Warren's Actions as FCCLA Advisor

While Mr. McWhorter testified that he expected the FCCLA students to be exposed to leadership activities outside of the community, such as state and national FCCLA meetings, Ms. Warren points out that "he never instructed [her] to do so prior to [the] end of 2008 evaluation."  (*Compare* Doc. 18-2 at 17-18, 20 *with*  Doc. 20 at 1 ¶ 9; *see also* Doc. 15-1 at 205 ("I reminded him[, *i.e.*, Mr. McWhorter,] that he hadn't said anything to me about [taking the FCCLA group to Atlanta] prior and I

didn't know that it was that important to him.")).   Also, Ms. Warren's 2007 Professional Development Plan ("PDP"), which was in place for the 2007-08 school term, contains no reference to attending FCCLA state and national meetings.  (Doc. 15-1 at Ex. 6 at 38-39).

The testimony of Mr. McWhorter and Ms. Warren differs over the handling of expenses for FCCLA state and national trips.  Mr. McWhorter testified that such expenses were to be paid out of the proceeds from chapter fundraisers.  (Doc. 18-2 at 18).  Ms. Warren, on the other hand, indicated "that school FCCLA fundraisers paid for the cost of running the club, such as refreshments for meetings, games, prizes, gifts for guests, rallies, and student activities such as farm city, county rally, and country dinner."  (Doc. 20 at 2 ¶ 10; *see also* Doc. 14-1 at 113-15).

Ms. Warren did not attend or take any of her students to the state or national FCCLA meetings in the 2005-06 school year.  AF No. 11.  During the 2006-07 school year, Ms. Warren did not attend or take any students to the state FCCLA meeting in Birmingham.   AF No. 12.1.   Ms. Warren testified that she mentioned the state FCCLA meeting to four or five students, but those students' jobs and financial situations precluded them from attending.  AF No. 12.2.  Ms. Warren did take three students to the national FCCLA meeting in Charlotte over the 2006-07 term.  AF No. 12.3.

During the 2007-08 school year, Ms. Warren did not attend or take any of her students to the state FCCLA meeting or the national FCCLA meeting in Atlanta.  AF No. 13.1.  Ms. Warren testified that she did not attend the national meeting in Atlanta because she could not find any other family and consumer science teachers within Cherokee County who were attending and felt there would be too many students who would want to attend.  (Doc. 14-1 at 23 at 87).   She also was concerned that her students could not afford the trip.  (*Id.*).  Yet, Ms. Warren did not ask her students or their parents whether they were interested in attending.  (Doc. 14-1 at 23-24 at 88-89).  Ms. Warren further indicated that she did not discuss with her students the costs of the Atlanta trip and whether they or their parents could afford them.  (Doc. 14-1 at 24-25 at 92-93).

At the state FCCLA meetings, students from various schools compete in a host of activities related to family and consumer science.  AF No. 14.1.  The state gatherings also involve speakers, entertainment and the election of statewide student officers.  AF No. 14.2.

Ms. Warren testified that she did not attend or take students to the state FCCLA meetings in any of her three years because no one specifically told her that she should attend.  AF No. 15.1.  During the 2005-06 and 2007-08 school years, Ms. Warren did not discuss the possibility of going to the state FCCLA meetings with her students.

AF No. 15.4.  Ms. Warren acknowledged that some of the other family and consumer science teachers affiliated with boards from other schools went to the state FCCLA meetings, either on their own or with students.  AF No. 15.2; (*see also* Doc. 14-1 at 96).

Ms. Warren testified that she was not paid for attending state and national FCCLA meetings due to the duration of the employment contract that she had with the BOE.  (Doc. 14-1 at 27-28 at 104-05).  Teachers who, unlike Ms. Warren, were on extended contracts had flexibility in how they could count days toward FCCLA activities.  (*Id.*).

Taking children to state and national FCCLA meetings was part of the job for which Ms. Warren was paid.  AF No. 17.1.  The other teachers, which Ms. Warren characterized as having extended contracts, were educators who were hired before April 2002 and did have ten (as opposed to nine) month contracts.  AF No. 17.2.  Ms. Warren's successor, Ms. Fox, the current family and consumer science teacher at Gaylesville, has taken students to state and national FCCLA meetings while on a nine month contract.  AF No. 17.3.

During her rehiring interview with Mr. McWhorter, Ms. Warren "discussed with him the fact that [she] had not been able to have a very successful [FCCLA] fundraiser during the three years."  (Doc. 15-1 at 11 at 196).  She further "reminded

him" about her request to do a talent show fundraiser during her third year, which had been denied on the basis that another club at the school would be doing it.  (*Id.*). Ultimately, the sponsor of that club did not go forward with a talent show and Ms. Warren's plan was to take that idea to the next year and "run with it[.]"  (Doc. 15-1 at 11-12 at 196-97).

### C.    Ms. Warren's 2006-07 School Year Evaluation

McWhorter is certified by the State of Alabama to conduct a Professional Education Personnel Evaluation ("PEPE").  AF No. 19.1.  There are several different instruments which make up a PEPE evaluation:  observations from the principal or assistant principal; a structured interview; a Supervisor Review Form, a Professional Development Plan ("PDP"); and an Evaluation Summary Report ("ESR"), which combines information from the other data collection instruments into a final score. AF No. 19.2.  There are four possible scores which can be given on these evaluation instruments: one is "unsatisfactory;" two is "needs improvement;"; three is "area of strength;" and four is "demonstrates excellence."  AF No. 20.

On May 24, 2007, after Ms. Warren's completion of her second year of teaching, she and Mr. McWhorter met to draft a PDP for the upcoming the 2007-08 school year.  AF No. 21.1.  In the PDP, McWhorter gave Ms. Warren a score of one in "leadership" and a score of two in "professional knowledge."  AF No. 21.2.  The

PDP indicated in the "Evaluator Comments" section:  "Evidence indicates teacher completed PDP objectives."  (Doc. 15-1 at 39).  The PDP cited the "FCCLA" as a way that Ms. Warren should demonstrate her improvement in leadership skills during the 2007-08 school year.  AF No. 21. 3.

### D.    Ms. Warren's 2007-08 School Year Evaluation

The May 2008 PEPE evaluation reflected Ms. Warren's failure to improve.  AF No. 22.2.  On the Supervisor Review Form, Mr. McWhorter stated that Ms. Warren "does not promote an active FCCLA which is an integral part of the FCS [family and consumer science] program."  AF No. 23.

When Mr. McWhorter and Mr. Keasler originally gave Ms. Warren the ESR, it was, according to Ms. Warren, "riddled with twos."  AF No. 24.  Ms. Warren testified that she convinced Mr. McWhorter to change the twos she saw on the ESR to threes, but she may not have seen all of the twos.  AF No. 25.

During Ms. Warren's conversation with Mr. McWhorter, Mr. Keasler sat at a computer and changed the scores in accordance with McWhorter's directions and printed a new ESR.  AF No. 26.  The revised ESR had all threes except in the category of "Professional Development and Leadership."  AF No. 27.1.  In that section, Ms. Warren received a score of two in "Improves Professional Knowledge and Skills" and a score of one in "Takes a Leadership Role in Improving Education."

AF No. 27.2.

Ms. Warren received an overall competency score of two in "Professional Development and Leadership."  AF No. 27.3.  In the comments for that section, the evaluation states that "[t]he most supportive evidence of the assigned score was found in the professional development plan (PDP)."  AF No. 27.4.  The May 2008 PDP referenced in the ESR stated "Promote Active FCCL" as an objective and attending FCCLA meetings and conventions as a proposed activity to meet this objective. AF No. 28.

Ms. Warren signed the last page of the ESR.  AF No. 29.1.  Above that signature block, the ESR lists all of the scores in the various categories, including the two and one that Ms. Warren received in the Professional Development and Leadership section.  AF No. 29.2.  Ms. Warren admitted that the entire ESR signature page was laid out in her direction when she signed it.  AF No. 29.3.  Ms. Warren also acknowledged that she saw the entire page, but did not read the one and two scores listed above her signature.  AF No. 29.4; AF No. 29.5.

### E.    BOE's Non-Renewal of Ms. Warren's Employment Contract

In May 2008, Mr. McWhorter recommended to Mr. Johnson that Ms. Warren's employment contract not be renewed because Ms. Warren had not shown leadership in the FCCLA program and had not taken her FCCLA students to any of the state

conventions and to only one national convention.  AF No. 33.1.[3] Ms. Warren had just completed her third year of employment.  AF No. 33.2.  If the Board failed to non-renew Ms. Warren's employment contract on or before the last day of the school year, she would automatically attain tenure which would make it difficult and expensive to terminate her employment if she continued to fail to meet expectations.  AF No. 33.3.

Mr. Johnson relies on the judgment of principals in making recommendations to the BOE about re-hiring or non-renewing the contracts of non-tenured teachers. AF No. 34.1.  In keeping with this practice, Mr. Johnson relied on Mr. McWhorter's opinion in making a recommendation to the BOE to non-renew the employment contract of Ms. Warren.  AF No. 34.2.

On May 27, 2008, the BOE voted in favor of Mr. Johnson's recommendation to non-renew Ms. Warren's employment contract.  AF No. 35.  At this May 27, 2008, meeting, the BOE voted to non-renew the contracts of eighteen other non-tenured teachers.  AF No. 36.1.  Of these eighteen other teachers, eleven were in their twenties, five were in their thirties, and only two were in their forties.  AF No. 36.2.

_____

[3] Ms. Warren inadequately attempts to dispute the BOE's stated rationale for terminating her employment by pointing to her EEOC charge and relying upon her belief that her contract was not renewed because of her age.  (Doc. 20 at 3-4 ¶ 33). Therefore, the fact is admitted for summary judgment purposes.

Eleven of these teachers were non-renewed because of the uncertainty of the state education budget.  AF No. 37.1  The education budget had not been passed by the legislature and those employees had to be non-renewed on or before the last day of the school in case their positions were not funded by the final bill.  AF No. 37.2.

The rest, including Ms. Warren, were non-renewed for other reasons.  AF No. 37.3.  On May 28, 2008, Ms. Warren received written notice of the non-renewal of her employment contract.  AF No. 38.

**F.     BOE's Recalling Process**

Once the state legislature adopted a budget, the BOE was able to bring back those eleven teachers who had been non-renewed purely because of the uncertainty of the budgetary situation.  AF No. 39.  The BOE did not re-post job openings for the eleven positions because those teachers had not been non-renewed for performance issues.  AF No. 40.

Of the remaining eight teachers not recalled, five of those were under forty, including three in their twenties.  AF No. 41.1.  Other than Ms. Warren, only two of the eight were over forty.  AF No. 41.2.  One of those was only forty-two.  AF No. 41.3.

**G.     BOE's Posting and Hiring Process**

On June 6, 2008, the BOE posted openings for nine positions, including the

12

position of family and consumer science teacher at Gaylesville.  AF No. 42.  On June

7, 2008, Ms. Warren wrote in her personal journal that she believed she had been

"fired unjustly" by the BOE.  AF No. 43.

On June 10, 2008, Ms. Warren was interviewed at Gaylesville by Mr.

McWhorter and Brett Keasler ("Mr. Keasler").  AF No. 44.1.  During the interview,

Ms. Warren stated that she was ready "to get the ball rolling with FCCLA."  (Doc. 15-

1 at 11 at 196).

Mr. McWhorter expressed his dissatisfaction with Ms. Warren's leadership of

the FCCLA.  AF No. 45.1.  Mr. McWhorter indicated that he was particularly

disappointed that Ms. Warren had not taken students to the national convention in

Atlanta and said that FCCLA was an opportunity for students to gain experiences

they might otherwise not have.  AF No. 45.2.  When Ms. Warren left the interview,

she had a negative feeling about her chances of getting her job back.  AF No. 45.3.

Mr. McWhorter and Mr. Keasler interviewed other candidates for the family

and consumer science teaching position.  AF No. 46.  One of the other candidates was

April Fox ("Ms. Fox"), who had a year of experience teaching family and consumer

science in another school district.  AF No. 47.  Mr. McWhorter did not ask Ms. Fox

about her activities with respect to the FCCLA program at her former school, but

stressed the importance of a strong and involved FCCLA program at Gaylesville.  AF

No. 48.

Based on the interviews, Mr. McWhorter believed that Ms. Fox was the best candidate for the position.  AF No. 49.1.  Moreover, if Ms. Fox, a first year teacher, did not meet expectations, her contract could be non-renewed after her first, second, or third years without having to go through the difficult and expensive termination process in the Alabama Teacher Tenure Act.  AF No. 49.2.

Mr. McWhorter recommended Ms. Fox to Mr. Johnson for the position of family and consumer science teacher at Gaylesville for the 2008-09 school year.  AF No. 50.1.  Had Mr. McWhorter not recommended Ms. Fox, he would have recommended someone other than Ms. Warren.  AF No. 50.2.

Mr. McWhorter testified that he did not recommend Ms. Warren for re-hiring for the position of family and consumer science teacher because he had already witnessed Ms. Warren's failure to meet expectations in leading the FCCLA program.  (Doc. 18-2 at 8 at 25, 26; Doc. 18-2 at 12 at 41; Doc. 19-3 ¶ 15).  Further, if Ms. Warren were re-hired, she would have automatically attained tenure since she had already completed three (3) years.  (*Id.*).  Finally, if Ms. Warren gained tenure, it would be difficult and expensive to terminate her employment if she continued to fail to meet expectations.  (*Id.*).

After receiving Mr. McWhorter's recommendation, Mr. Johnson recommended

Ms. Fox to the BOE for the open family and consumer science teaching position at Gaylesville for the 2008-09 school year.  AF No. 52.1.  At a public meeting on June 19, 2008, the BOE voted to accept Mr. Johnson's recommendation and hired Ms. Fox. AF No. 52.2.

At the time of the recommendation, Mr. Johnson did not know Ms. Fox's age, nor did he communicate information about age to the Board.  AF No. 53.  By June 21, 2008, Ms. Warren had learned from Mr. Keasler that someone else was hired by the BOE for the family and consumer science teaching position.  AF No. 54.1.  However, Ms. Warren did not ask Mr. Keasler who had been hired.  AF No. 54.2.

Upon learning that she would not be re-hired, Ms. Warren immediately began to consider suing the BOE.  AF No. 55.  Specifically, Ms. Warren testified that she "wasn't sure what kind of complaint that [she] would be able to make[, but that she] was investigating it."  (Doc. 15-1 at 18 at 222).  Ms. Warren did not learn who was hired for her former position until an e-mail she received on July 24, 2008.  AF No. 56.

Ms. Fox has held the position of family and consumer science teacher since August 2008.  AF No. 57.1.  Ms. Fox has taken students to state and national FCCLA meetings and has held successful fund raisers to pay for these trips.  AF No. 57.2. Ms. Fox has a nine month contract with the BOE.  AF No. 58.

### H.    EEOC Proceedings

On December 23, 2008, Ms. Warren filed a charge of discrimination with the EEOC alleging that she was not re-hired by the BOE because of her age.  AF No. 59. On January 26, 2010, the EEOC sent a letter to Ms. Warren stating that it was closing her file and issuing a notice of right to sue.  AF No. 64.1.  The EEOC stated that it was terminating the case because Ms. Warren's "charge was not timely filed with the EEOC; in other words, [Ms. Warren] waited too long after the date(s) of the alleged discrimination to file [her] charge."   AF No. 64.2.

## III.   STANDARD

### A.    Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'"  *International Stamp*

*Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## B.    Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden

of proving that the adverse employment decision was made because of intentional

discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133

(2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY

Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme

Court previously established the basic allocation of burdens and order of proof in a

disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v.

Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there

is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d

590, 595 (11th Cir. 1987).[4]

---

[4] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 782 (11th Cir. 1989) (footnote omitted).  Based upon this standard and in the absence of a record of <u>any</u> invidiously-charged utterances, Ms. Warren's case is purely a circumstantial evidence one.  (*See, e.g.*, Doc. 20 at 21 ("A plaintiff may demonstrate pretext by directly persuading the court that a discriminatory reason more likely motivated the employer or, alternatively, by indirectly showing the employer's proffered explanation is unworthy of credence.") (citation omitted)).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## C.    ADEA Discrimination

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to fall under the ADEA's protections, an employee must be "at least 40 years of age[,]" 29 U.S.C. § 631(a), and the plaintiff "retains the burden of persuasion to

establish that age was the 'but-for' cause of the employer's adverse action."[5]  *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2351 (2009) (emphasis added).

The Eleventh Circuit "has adopted a variation" of the *prima facie* case standard articulated by the Supreme Court for Title VII claims in *McDonnell Douglas* for cases arising under the ADEA. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir.1992).  "Under this variation of the *McDonnell Douglas* test for establishing a *prima facie* case of discrimination, the plaintiff must show that he (1) was a member of the protected group of persons between the ages of 40 and 70, (2) was subject to adverse employment action, (3) was replaced with [or not selected for a position over] a person outside the protected group, and (4) was qualified to do the job."  *Mitchell*, 967 F.2d at 566 (citation omitted); *see also Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) ("To establish his *prima facie* case of discriminatory failure to promote, Standard must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position.") (citation omitted).

"If this is done, the defendant has the burden of going forward and articulating

_____

[5]  In contrast to the motivating factor standard that is applicable in Title VII and other discrimination lawsuits.

a legitimate, non-discriminatory rationale for the [adverse employment action]."

*Verbraeken  v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

"Finally, if the defendant rebuts the presumption of discrimination, the plaintiff must

prove by a preponderance of the evidence that the employer's asserted reason is

merely a pretext for a discriminatory [action]." *Id.* (footnote omitted).

## IV.   ANALYSIS

### A.   Timeliness of Ms. Warren's ADEA Claim

Here, the BOE maintains that Ms. Warren's ADEA claim is procedurally barred

as untimely.  Ms. Warren counters that equitable tolling should apply to save her age

discrimination claim from any administrative staleness.

The applicable deadline for a plaintiff to timely file a charge in Alabama under

the ADEA is 180 days. *See Jones  v. Dillard's, Inc.*, 331 F.3d 1259, 1266, 1263 (11th

Cir. 2003) ("Thus, the Court examines the timeliness of Byrd's ADEA claim [filed

in Alabama] in the context of the 180-day rule."). In this lawsuit, Ms. Warren filed

her charge with the EEOC on Tuesday, December 23, 2008.  (Doc. 1 at 9-11).

The record reflects and Ms. Warren does not dispute that she generally learned

that she would not be rehired by the BOE no later than June 21, 2008.  Based upon

a triggering date of June 21, 2008, and absent any equitable tolling, Ms. Warren

should have filed her EEOC charge no later than Thursday, December 18, 2008, for

her claim to be timely.

However, the parties agree that Ms. Warren did not learn about her younger replacement, Ms. Fox, until July 24, 2008.[6]  Based upon a triggering date of July 24, 2008, the 180-day charge-filing deadline ran on Tuesday, January 20, 2009, and Ms. Warren's claim is timely.

As the Eleventh Circuit has explained equitable tolling:

> Again, the proper focus for when a statute of limitations begins to run is the time of the discriminatory act. *Chardon*, 454 U.S. at 8, 102 S. Ct. 28; *Nance*, 186 F.3d at 1341. This rule would suggest that, among the three above dates, the first choice, April or May 1999, was the appropriate starting date of the limitations period for Byrd's claims. The Court finds, however, that this case bears sufficient similarity to *Sturniolo* to apply equitable tolling.  As such, the charging period did not begin until Byrd learned of the Company's hiring of Winters, or November 1, 1999. . . .
>
> In both <u>*Hargett* and *Turlington*, the plaintiffs had sufficient evidence of their age discrimination claims to file an EEOC charge within the limitations period. In *Hargett*, the plaintiff learned of his younger replacement, but still waited eleven months to complete an EEOC questionnaire and another three months before filing an EEOC charge</u>. In *Turlington*, the plaintiff had sufficient evidence of age

---

[6] This date is driven by the parties' undisputed facts.  According to her charge of discrimination, Ms. Warren began to "believe that [she was] a victim of age discrimination under the Age Discrimination in Employment Act of 1967" based upon events and knowledge she obtained in or around June 30, 2008.  (Doc. 1 at 11). However even assuming that the earlier date of June 30, 2008, is the appropriate triggering point, equitable tolling still saves Ms. Warren's claim, as the 180-day period would run on Saturday, December 27, 2008, and Ms. Warren filed her charge before then, *i.e.*, on December 23, 2008.

discrimination when he was excluded from training programs available to his younger colleagues. His knowledge of this evidence was demonstrated by <u>his vigorous protest and soliciting the help of a lawyer to combat his employer's practices</u>. These decisions are wholly consistent with the rationale of the early case of *Reeb*: <u>The applicable limitations period did not begin to run until the facts supporting a cause of action became apparent or should have became apparent to a reasonably prudent person with concern for his or her rights</u>.

*Jones*, 331 F.3d at 1266, 1267 (emphasis added).

Unlike *Turlington*, there is little to no indication (*i.e.*, such as proof of protesting employment practices that she perceived to be age-biased, retaining counsel to represent her in a pre-lawsuit pursuit of a settlement based upon age discrimination, or taking other similar measures) that Ms. Warren had "sufficient evidence of age discrimination" such that equitable tolling her ADEA claim not be appropriate. *Jones*, 331 F.3d at 1267; *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (11th Cir. 1998) ("ADEA's timing requirements might have been equitably tolled if, in the period prior to the 180 days before filing the initial EEOC charge, Turlington had <u>no reason to believe he was a victim of unlawful discrimination</u>.") (emphasis added); *Turlington*, 135 F.3d at 1435 ("Moreover, Turlington <u>retained his district court counsel at least as of July 9, 1993</u>, upon being transferred out of the IS Department.") (emphasis added); *Turlington*, 135 F.3d at 1436 (citing *McClinton v. Ala. By-Products Corp.*, 743 F.2d 1483, 1487 (11th Cir.

1984) ("rejecting equitable tolling where ADEA plaintiff 'suspects that he may have been discriminated against on account of age and is also generally aware of his legal right to obtain redress for that wrong'") (emphasis added)).

The court expressly rejects the notion that Ms. Warren's lay entry in her journal on June 7, 2008, that she had been "fired unjustly" and her admission that she, unaware of the specific nature of such a possible action, began considering (without the assistance of counsel) whether to file a lawsuit shortly after the BOE's decision not to rehire her, without more, adequately establish that she had "reason to believe [s]he was a victim of unlawful discrimination." *Turlington*, 135 F.3d at 1435 (emphasis added); *cf. Jones*, 331 F.3d at 1268 ("Moreover, we are unwilling to close the door on her claims based simply on her handwritten note that she suspected age discrimination.") (emphasis added).  In other words, the record does not substantiate that Ms. Warren reasonably believed that she had been unlawfully discriminated on the basis of age by the BOE until she discovered that the younger Ms. Fox had been hired as the next family and consumer science teacher at Gaylesville.[7]

---

[7] None of the additional authorities cited by the BOE in its reply persuades this court otherwise about its decision to equitably toll Ms. Warren's charge-filing statute of limitations.  The bulk of these are either non-binding unpublished opinions from the Eleventh Circuit or other district courts and/or involve cases that arise under the Social Security Act. (*See, e.g.*, Doc. 22 at 4-5).  Moreover, the BOE has not pointed to one controlling decision from the Eleventh Circuit arising under the ADEA in which a plaintiff must show extraordinary circumstances such as fraud,

Therefore, applying equitable tolling principles, Ms. Warren's ADEA failure to rehire claim is not administratively stale. Accordingly, summary judgment in favor of the BOE on the procedural ground of untimeliness is due to be denied.

**B.     Merits of Ms. Warren's ADEA Claim**

**1.     Ms. Warren has established a *prima facie* case of age discrimination.**

The BOE does not dispute and the record confirms that Ms. Warren has established a *prima facie* case of age discrimination claim under the ADEA as she was over the age of 40 at the time she was not re-employed by the BOE (*see* Doc. 1 at 11 ("I am fifty years of age.")), and someone outside of her protected class (*i.e.*, Ms. Fox, age 22, at the time of the decision (*see* Doc. 16-3 at 3 at 8)) was selected over her. (*See* Doc. 13 at 21 n.2 ("For purposes of this motion only, the Board concedes that Warren can establish a *prima facie* case."); *see also* Doc. 20 at 21 ("Defendant has conceded for the purposes of this motion, in a footnote, that Plaintiff can establish a *prima facie* case.")).

**2.     The BOE has met its burden of production.**

The record also shows that the BOE has offered a non-discriminatory explanation for the decision not to rehire Ms. Warren. More specifically, as the BOE

_____

misinformation, or deliberate concealment, in order for equitable tolling to apply.

summarizes the reasoning behind its actions:

> Warren had not shown leadership in the FCCLA program. She had not taken her FCCLA students to the state convention in any of her three years and had only attended one national convention. Warren would have attained tenure if she had been re-hired, making it difficult and expensive to terminate her employment if she continued to fail to meet expectations.

(Doc. 13 at 21-22).

### 3.   Ms. Warren has not produced sufficient evidence of pretext.

In evaluating the issue of pretext, "[t]he district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations omitted). In this instance, the court determines that the record lacks "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *See MacPherson v. University of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041,1045 (11th Cir. 1998)).  In sum and as elaborated upon below, Ms. Warren has failed to adduce sufficient evidence for a reasonable jury to conclude that her age was the but-for cause behind the BOE's decision not to rehire her as

Gaylesville's 2008-09 family and consumer science teacher.

Ms. Warren premises her pretext argument upon two primary points.[8]  One, "there is a dispute of a material fact as to whether Mr. McWhorter ever asked Ms. Warren to participate in state and national FCCLA meetings or expressed any disappointment in her job performance prior to the availability of a much younger candidate for the position." (Doc. 20 at 22; *see also* Doc. 22 at 8).  Two, "Ms. Fox's background demonstrates that the [BOE]'s articulated reason is pretext." (Doc. 22 at 8).

The evidence, taken together and in a light most favorable to Ms. Warren which the court is obligated to do on summary judgment, shows that well before the BOE posted a notice for applicants on June 6, 2008, Ms. Warren had knowledge of Mr. McWhorter's dissatisfaction with her performance in the area of the FCCLA. Specifically, in the May 2007 PDP, Mr. McWhorter gave Ms. Warren a score of one in leadership skills and a score of two in professional development.  Mr. McWhorter also stated in this PDP that Ms. Warren should "improve leadership skill in students"

---

[8]  Any of Ms. Warren's subsidiary issues of pretext are underdeveloped and/or are similarly unavailing.  *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)).  "[T]he onus is upon the parties to formulate arguments[.]"  *Dunmar*, 43 F.3d at 599 (citation omitted).

and expressly cited to the "FCCLA."

Further, on the May 2008 Supervisor Review Form, Mr. McWhorter reported that Ms. Warren "does not promote an active FCCLA which is an integral part of the FCS program" and indicated that an activity to promote an active FCCLA was to attend FCCLA meetings and conventions.  Additionally, the BOE voted not to renew Ms. Warren's contract on May 28, 2008.  Therefore, the evidence fails to substantiate Ms. Warren's contention that a reasonable jury could conclude that the BOE's dissatisfaction with her job performance, including specifically in the area of FCCLA, surfaced only after the younger Ms. Fox was being considered as a candidate for Gaylesville's next family and consumer science teacher.

Ms. Warren also attempts to compare her qualifications to that of Ms. Fox as a basis for pretext; however, those efforts are not persuasive here.  As the Supreme Court has clarified the use of qualifications as a means for demonstrating pretext in discrimination cases:

> The visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications. Federal courts, including the Court of Appeals for the Eleventh Circuit in a decision it cited here, have articulated various other standards, *see, e.g., Cooper, supra*, at 732 (noting that "<u>disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question</u>"

(internal quotation marks omitted)); *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (C.A. 9 2003) (holding that qualifications evidence standing alone may establish pretext where <u>the plaintiff's qualifications are " 'clearly superior' " to those of the selected job applicant</u>); *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1294 (C.A.D.C. 1998) (en banc) (concluding the factfinder may infer pretext if "a reasonable employer would have found <u>the plaintiff to be significantly better qualified for the job</u>"), and in this case the Court of Appeals qualified its statement by suggesting that superior qualifications may be probative of pretext when combined with other evidence, *see* 129 Fed. Appx., at 533. This is not the occasion to define more precisely what standard should govern pretext claims based on superior qualifications. Today's decision, furthermore, should not be read to hold that petitioners' evidence necessarily showed pretext. The District Court concluded otherwise. It suffices to say here that some formulation other than the test the Court of Appeals articulated in this case would better ensure that trial courts reach consistent results.

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58, 126 S. Ct. 1195, 1197-98 (2006) (emphasis added).

In this case, Ms. Warren cannot meet the *Ash* standard, regardless of Ms. Fox's qualifications *vel non*, because the undisputed evidence shows that Mr. McWhorter had eliminated Ms. Warren as a candidate for re-hire because of her prior teaching record, which demonstrated a lack of leadership with respect to the FCCLA program. Additionally, at best, Ms. Warren has shown that both she and Ms. Fox (at a prior school) had prior experience as family and consumer science educators and that both had failed to take their students to state or national FCCLA meetings with the one exception of the national meeting that Ms. Warren attended during the 2006-07 term.

Accordingly, no reasonable jury could conclude that Ms. Warren's qualifications were "clearly superior" to those of Ms. Fox.

Additionally, Ms. Warren fails to show pretext in the BOE's additional non-discriminatory rationale for hiring Ms. Fox and not rehiring her–Ms. Fox's status as a first year teacher and Ms. Warren's position as a tenured teacher if she were to be re-hired.  In particular, the BOE stated a concern about the associated protections that Ms. Warren would receive under the Teacher Tenure Act, if she continued to fail to meet expectations upon being rehired to the position of family and consumer science teacher.  In contrast, in hiring Ms. Fox, the BOE was afforded more flexibility if her performance proved to be substandard.

As the Supreme Court has succinctly stated regarding pretext:

Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (emphasis in original) (citations omitted).  Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse employment decision, judgment as a matter of law in favor of the employer would still be appropriate if the record:  1) conclusively demonstrates some other, non-discriminatory basis for the decision; or 2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal discrimination took place.

Here,  Ms. Warren's opposition, at best, fails to meet her burden to establish that the BOE's cited reasons for its decision not to rehire Ms. Warren are pretextual. Accordingly, no reasonable jury could reach a verdict in Ms. Warren's favor, and summary judgment is due to granted in favor of the BOE on the merits.

## V.   CONCLUSION

Therefore, for the reasons explained above, the BOE's Motion is due to be granted on the merits and otherwise denied.  The court will enter a separate order.

**DONE** and **ORDERED** this the 20th day of July, 2011.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

30